UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         vs.<br><br>DAVID JOHN SCHWARTING,<br><br>                    Defendant. | 5:14-CR-50100-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 96).  A hearing was held on December 14, 2016.  Defendant was personally present and represented by his attorney of record, Jamy Patterson.  The Government was represented by Eric Kelderman. Five witnesses testified at the hearing. Four exhibits were received into evidence.  Based on a careful consideration of all the evidence, and counsel's written arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied in its entirety.

## **JURISDICTION**

Defendant is charged in an Indictment with Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).  The pending Motion was referred to the Magistrate Judge

pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's

Standing Order dated March 9, 2015.

## **FACTUAL BACKGROUND**

Around 11:05 a.m. on September 13, 2014, South Dakota Highway

Patrol Trooper Zac Bader ("Trooper Bader") stopped John Harold ("Harold") and

Billie Jo Pentilla ("Pentilla") for speeding.  Subsequent to this stop, Trooper

Bader conducted an exterior search of the vehicle with his drug dog, which

alerted to the presence of an illegal substance.  Trooper Bader then searched

the vehicle, and located eight (8) ounces of methamphetamine.  Harold told

Trooper Bader that he had purchased the drugs from a Native American male,

at a Rapid City, South Dakota hotel, and that he had done this numerous

times before.  Harold identified the individual as "Dave Schwartein."

Harold told Trooper Bader that he had met this individual about five

weeks prior to this encounter, through work with Sands Drywall Company in

Sioux Falls, South Dakota.  Harold gave further details regarding the drug

transactions between himself and "Dave Schwartein," in his interview with

Department of Criminal Investigation ("DCI") Agent Bob Palmer ("Agent

Palmer").  Harold informed that he met "Dave Schwartein" in the parking lot of

"the hotel with Minerva's[1] inside of it, which is just off the interstate." (Doc. 79-

1 Pg. 4).  In the parking lot, "Dave Schwartein" delivered a bag of

methamphetamine to Harold, in which Harold thought there was around 4 oz

of methamphetamine.  Harold told Agent Palmer that he had similar

---

[1] Minerva's restaurant and bar is located in the Ramkota Hotel in Rapid City, South Dakota.

transactions with "Dave Schwartein" "over the past five weeks." (Doc. 79-1 Pg.

5). Harold informed Agent Palmer that sometime, the week prior, he deposited

$9,000 into an account that "Dave Schwartein" supplied the name and account

number for. Id. Each week, Harold either deposited money into the account

"Dave Schwartein" provided, or paid someone to money gram the currency

through Wal-Mart to a name "Dave Schwartein" gave him. Harold informed

Agent Palmer that he had acquired methamphetamine from "Dave" five times in

the past, and sent over $20,000 to "Dave" in the prior five weeks for

methamphetamine. Each of the five times Harold received methamphetamine

from "Dave," he rented a car in Sioux Falls, SD, and drove to Rapid City, SD,

where he met with "Dave" in the parking lot, and was given the

methamphetamine. Id.

Harold informed Agent Palmer that "Dave" could be staying at the

Ramkota Hotel, in Rapid City, South Dakota, but was not certain. Id. When

asked by Agent Palmer what kind of car "Dave Schwartein" drove, Harold said

he wasn't sure, but advised that the last time he saw him; he was in a maroon

Cadillac. Id. Harold believed "Dave Schwartein" had a girlfriend, who was from

Colorado. Id. Following the receipt of this information, Agent Palmer spoke

with DCI Special Agent Dan Byron ("Special Agent Byron"), who informed him

that a "David Schwarting" ("Defendant") was in their system, and that he was

familiar with Defendant. Id. Special Agent Byron had informed Agent Palmer

that a maroon Cadillac, registered to Defendant, was parked at a residence

listed under Defendant's name, in Sioux Falls, South Dakota. Id.

Agent Palmer then spoke with management at the Ramkota Hotel in Rapid City, South Dakota, on September 13, 2014. Id. Hotel management advised that a man, by the name of David Schwarting, was staying in Room 2713, and was scheduled to leave on September 14, 2014. Id. Management further advised Agent Palmer that a gray Jeep, with Colorado license plates, was registered to Room 2713. Id. After receiving this information, law enforcement went to the Ramkota Hotel in Rapid City, South Dakota. Id. Pennington County Sheriff's Deputy BJ George ("Deputy George") went to the Ramkota Hotel around 8:00 p.m., and located a gray Jeep Grand Cherokee, with Colorado license plates, #874TYR, parked in front of the room. Id.

Agent Palmer prepared an affidavit in support of a state search warrant for the hotel room and the vehicle. Id. At around 8:50 p.m., while Agent Palmer was preparing the affidavit, law enforcement observed the gray Jeep Grand Cherokee leaving the hotel parking lot. Id. Deputy George stopped the vehicle a short distance away from the hotel property, at a gas station. Id. Defendant and his girlfriend were located inside of the vehicle. The two were detained, while the search warrant was being prepared and executed.

Deputy George testified at an evidentiary hearing, held on December 14, 2016, that Defendant and his girlfriend, Adelita Urioste ("Urioste"), were detained shortly after being approached at the gas station. Prior to detaining Defendant, Deputy George testified that he briefly spoke to Defendant and Urioste and explained that they were seeking a search warrant. Deputy George asked if they had any weapons on their person and asked for consent to search

4

their person.  (FTR 11:14:45).  Mr. Schwarting consented to the search of his person.  (FTR 11:15).  Deputy George performed a search of the Defendant's person wherein he located a wallet.  Inside the wallet was a Ramkota room key and Mr. Schwarting's identification card.  Mr. Schwarting and Urioste were put in handcuffs, and placed in the back of a police vehicle.  Both Defendant and Urioste were subsequently taken from the gas station to the Ramkota Hotel, where the search warrant was to be executed on Defendant's hotel room.

Agent Palmer completed the application for the state court search warrant at 10:01 p.m., and obtained the warrant to search Defendant's hotel room.  Defendant now seeks to suppress evidence seized from his hotel room, as fruits of an illegal search and seizure of his person, from which the key card to his hotel room was obtained, during the traffic stop on September 13, 2014.

## DISCUSSION

Defendant argues that his Fourth Amendment Rights were violated on September 13, 2014, asserting that Rapid City Police stopped the car he was driving without reasonable suspicion, detained him without probable cause, searched his person without consent, all of which, Defendant argues, was done without a warrant.  Defendant also argues that the evidence obtained from the hotel room should be suppressed as a result of the "fruits of the poisonous tree" doctrine.

The United States argues that law enforcement had a reasonable, articulable suspicion that criminal activity was afoot, based on information obtained from Harold, as well as verification with Special Agent Byron and

Rapid City Police Officers.  The United States asserts that the stop of the vehicle Defendant was driving was a lawful stop. The United States further argues that a search warrant was issued by a South Dakota state court Magistrate Judge for Defendant's hotel room and vehicle he was driving, and therefore, the search and seizure of Defendant and the vehicle he was driving was legal.  This Court begins its analysis of Defendant's motion by addressing whether Rapid City Police had reasonable suspicion to stop Defendant once he left the parking lot of the Ramkota Hotel in Rapid City, South Dakota.

**A.  Reasonable Suspicion**

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  It is well established that a roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment.  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).  For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest.  Id.  As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1, (1968). Id.  Generally, such a stop must be supported by reasonable, articulable suspicion that criminal activity is afoot.  Id.

In Terry, the United States Supreme Court recognized that 'a police officer may in appropriate circumstances, and in an appropriate manner, approach a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest.'  Adams v. Williams,

407 U.S. 143, 145, (1972).  The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur, or a criminal to escape.  Id.  On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.  Id.  A brief stop of a suspicious individual, in order to determine his identity, or to maintain the status quo momentarily while obtaining more information, may be most reliable in light of the facts known to the officer at the time.  Id.

At the time of Defendant's traffic stop, law enforcement had the following information: Harold recently informed law enforcement that he first purchased methamphetamine from "Dave Schwartien," five weeks prior.  Since that time, he completed numerous drug transactions with "Dave."  Harold advised that "Dave" lived near 6th and Franklin Street in Sioux Falls, SD, and that he drove a maroon Cadillac.  Law enforcement located a maroon Cadillac near the area described by Harold, ran the plates and confirmed that the vehicle was registered to David Schwarting.  Harold advised that "Dave's" girlfriend was from Colorado, and that "Dave" instructed him to deposit the drug purchase money into his girlfriend's Wells Fargo checking account.  Harold described "Dave" as a short, Native American, with a muscular build.  Harold believed that "Dave" was staying at the hotel with a Minerva's in it, because Harold met "Dave" at Minerva's and said that his girlfriend wasn't going to join them, as she was upset about something.  Harold's girlfriend was also interviewed by

law enforcement and she gave a consistent account that the drug transaction took place in the Minerva's parking lot.

Deputy George went to the Ramkota and confirmed with hotel personnel that Defendant was staying in Room 2713. Records showed that a gray jeep was associated with the room. Law enforcement drove to the parking area adjacent to Room 2713 and observed a gray jeep with Colorado plates. They ran the plates and learned that the vehicle belonged to Urioste. Deputy George kept the gray jeep under surveillance, while other law enforcement agents worked to prepare and present a search warrant. Before the search warrant was finalized, law enforcement observed a male and a female get into the gray jeep and leave the parking lot.

A traffic stop was made in the gas station parking lot, which is located adjacent to the Ramkota parking lot.   All of this collaborated information indicates that at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, of which they had reasonable, trustworthy information, was sufficient to warrant a prudent man into believing that Defendant had committed or was committing an offense. Based on the statements obtained from Harold, verified by Special Agent Byron, information was reasonably trustworthy and sufficient enough to warrant a belief that Defendant had committed, or was committing a crime out of his hotel room at the Ramkota Hotel in Rapid City, South Dakota.

Defendant argues, however, that no information has been provided to indicate that Harold, himself, was a reliable source of information. Defendant

asserts that Harold was already on federal felony parole, had four prior felony drug convictions, and police reports mention nothing of Harold's character for truthfulness or a past history for reliability.  The United States argues Harold's report was consistent with law enforcement's independently confirmed intelligence, thereby making it sufficiently reliable to support a probable cause finding.

### 1.  Harold's Reliability as an Informant

The United States Supreme Court, in <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983), adopted a "totality of the circumstances" approach to determining whether an informant's tip establishes probable cause, whereby the informant's veracity, reliability, and basis of knowledge are highly relevant. <u>Alabama v. White</u>, 496 U.S. 325, 325 (1990).  These factors are also relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard.  <u>Id</u>.

The totality of the circumstances demonstrates that significant aspects of Harold's story were sufficiently corroborated by the police to furnish reasonable suspicion.  In <u>Terry</u>, the Supreme Court stated that the officer [making a *Terry* stop] . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion' or "hunch." The Supreme Court has held that probable cause means 'a fair probability that contraband or evidence of a crime will be found.'  <u>Id</u>.  Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that

required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.  Id.  Because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity. Id.

Harold's information about Defendant's place of residence, the particular make and color of Defendant's personal vehicle, the state of origin of Defendant's girlfriend, as well as the specificity as to where Harold believed Defendant would be located, indicate that Harold had a special familiarity with Defendant's affairs.  Only a small number of people are generally privy to information such as an individual's car color, location, and other personal matters.  It is therefore reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. The general public would not be able to describe such material information about a specific person's precise whereabouts, as well as facts about an individual's personal life, as described to Agent Palmer by Harold.  This information, corroborated by law enforcement's independent findings establishes that under the totality of the circumstances, Harold's information exhibited sufficient indicia of reliability to justify an investigatory stop of Defendant's car.

Accordingly, the fact that Harold was already on parole and had four prior felony convictions is of minimal significance to this court, as the usefulness of Harold's information was within the confines of the United States

Supreme Court's "totality of circumstances" approach, in determining whether an informant's tip establishes probable cause and reasonable suspicion.

## B.  Probable Cause to Detain Defendant and Consent to Search his Person

Defendant argues that Rapid City Police detained him without probable cause, and searched his person without consent, all of which were done without a warrant and in violation of the Fourth Amendment.

Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed a crime.  There need only be a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity.  United States v. Torres-Lona, 491 F.3d 750, 755-756 (8th Cir. 2007).  There must be evidence, which would "warrant a man of reasonable caution in the belief" that a crime has been committed.  Wong Sun v. United States, 371 U.S. 471, (1963).

Probable cause depends 'upon whether, at the moment the arrest was made . . . the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing the suspect had committed or was committing an offense.  Alabama v. White, 496 U.S. 325, 325 (1990).  Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.  Id.  Rather, the court will evaluate generally the circumstances at the time of the arrest to decide if the officer had probable cause for his action.  Id.

Based on the totality of the facts and circumstances presented, as outlined above, this court finds that probable cause existed at the time of the traffic stop. There was sufficient evidence providing a probability or substantial chance that Defendant had been selling methamphetamine, based on Agent Palmer's interview with Harold and independent corroboration by law enforcement. This court believes that a prudent man in this situation would believe that Defendant was in fact the same individual that Harold had spoken of, and therefore, probable cause existed at the time of the traffic stop on September 13, 2014.

### 1. De Facto Arrest:

Defendant argues that he was detained for over an hour, without a search warrant; that he "has always rejected any argument that the stop of the vehicle on September 13, 2014 constituted a Terry stop, and rather, Defendant's detention by UNET agents and law enforcement, while waiting for [the officers] to obtain a search warrant, was a *de facto* arrest in violation of Defendant's Fourth Amendment," (Doc. 105, p. 2)(citing United States v. Miller, 974 F. 2d 953, 956 (8th Cir. 1992)).

An investigative stop must be supported by reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. Terry v. Ohio, 392 U.S. 1, 32, (1968). As determined above, this Court believes that law enforcement officers had a reasonable, articulable suspicion to stop Defendant in his vehicle, and had probable cause to detain Defendant.

After an initial stop, the resulting detention must be no longer than reasonably necessary, and must be reasonably related to the circumstances which initially justified the stop.  Illinois v. Caballes, 543 U.S. 405, 407 (2005); United States v. Sharpe, 470 U.S. 675, 685-687 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983).  There are no rigid time limitations on a Terry stop. Sharpe, 470 U.S. at 685; United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993).  Rather, the court is to consider the purposes for which law enforcement stopped the vehicle, as well as the time reasonably needed to effectuate those purposes.  Sharpe, 470 U.S. at 685.  The court must consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  Id. at 686.  It is the government's burden to prove that a detention pursuant to reasonable suspicion was sufficiently limited in scope and duration.  Royer, 460 U.S. at 500.

Whereas, a *de facto* arrest occurs when an officers' conduct is more intrusive than necessary for investigative stop.  United States v. Bloomfield, 40 F.3d 910 (8th Cir. 1994).  In determining whether an investigatory stop has become a *de facto* arrest, courts must consider law enforcement purposes to be served by the stop, as well as time reasonably needed to effectuate those purposes.  Id.  Although there is no rigid time limitation on Terry stops, time is an important factor in distinguishing between investigative stop and a *de facto* arrest.  Id.  In determining whether an investigative stop or arrest has occurred, the court is to consider whether the suspect has been transported

13

from one location to another or isolated from others, as well as any unnecessary delay, use of handcuffs, or confinement to police car.  Id.

This court finds that the government failed to demonstrate that Defendant's detention was sufficiently limited in scope and duration, as there was no indication that his detainment was intended to be for the minimum amount of time necessary.  On the contrary, he was being held until such time as a warrant was obtained.  In addition, other factors would indicate that this investigatory stop had become a *de facto* arrest.  Deputy George testified at the December 14, 2016, evidentiary hearing that Defendant and Urioste were both detained in handcuffs shortly after contact was made with them.  They were both subsequently confined to a police vehicle.  Once detained, both Defendant and Urioste were transported from the gas station to the Ramkota Hotel, where the search warrant was to be executed.  Deputy George also testified that he believed that both Defendant and Urioste were not free to leave the scene, at this point.

Accordingly, under the guidance set forth in Bloomfield, this court agrees that the detention was, in fact, a *de facto* arrest, and not a Terry Stop. However, the arrest was nonetheless valid, because it was supported by probable cause, for the reasons previously discussed *supra*.

**2.  Search of Defendant's Person**

Defendant argues that law enforcement searched his person, without consent.  Mr. Schwarting seeks to suppress the hotel room key and photo identification card found in his wallet.  The search occurred prior to Defendant

14

being put in handcuffs and placed in to the back of a police vehicle.  Even though the investigatory stop later turned into a *de* facto arrest, this court will analyze the search of Defendant's person under the consent doctrine, rather than as a search incident to arrest.

Consent to search is valid if the "totality of the circumstances demonstrates that the consent was voluntary."  United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).  The Government must prove voluntariness by a preponderance of the evidence.  Id.  Consent is voluntary if it is the product of the free and unconstrained choice of its maker, rather than duress or coercion. Id.  The characteristics of the accused which should be considered are: (1) his age; (2) his general intelligence and education; (3) whether he is intoxicated or under the influence of drugs when consenting; (4) whether he had been informed of his Miranda rights when consenting; (5) his previous experience with the criminal justice system.  Characteristics of "the environment in which consent was given" include: (1) whether the interrogation was lengthy; (2) whether the suspect was threatened or physically intimidated; (3) whether the suspect relied on any promises or misrepresentations by law enforcement officers; (4) whether the suspect was in custody or under arrest when consent was given;  (5) whether the suspect was in a private or secluded place when consent was given; and (6) whether he objected or stood silently by while the search occurred.  Id. at 381.  Also, "when a person consents to a search after officers state they will attempt to obtain a search warrant if the person does not consent, the consent is not necessarily coerced."  United States v. Severe, 29

15

F.3d 444, 446 (8th Cir. 1994), <u>cert.</u> <u>den.</u> 513 U.S. 1096, 115 S.Ct. 763, 130

L.Ed.2d 660 (1995).

Here, law enforcement approached Mr. Schwarting after the vehicle he

was riding in pulled up at a gas station.  Law enforcement explained that they

were working to obtain a search warrant.  They asked if he had any weapons,

bombs or other items on his person that would present any danger to law

enforcement.  Defendant denied that he had any such item on him.  Law

enforcement asked him for consent to search his person to verify that he didn't

have any weapons.  Deputy George testified that consent was given.

In applying the factors above, the court finds that Defendant is of legal

age.  His education level is unknown; it was reported that he worked at Sands

Drywall and gave instructions to have money wired into his girlfriend's bank

account; there was no indication that he was intoxicated or under the influence

of drugs when he consented.  Law enforcement did not inform him of his

Miranda rights when asking for consent to search. However, Defendant

exhibited his knowledge of the criminal justice system by asking questions of

law enforcement regarding search warrant protocol.  (Exhibit 3).  The contact

with Defendant occurred in a public place, the request for consent was very

brief, as was the search of his person.  There is no evidence of threatening or

intimidating conduct on behalf of law enforcement.  At the time he was

searched, Defendant was not in custody.  Defendant never withdrew consent.

Although law enforcement informed Defendant that they were in the process of

obtaining a warrant, this alone, does not mean that consent was coerced.

When considering the above factors under the totality of the circumstances, this court finds that Defendant's consent to search was voluntary.  Therefore, the search of Defendant's person did not violate the Fourth Amendment.

## C.  Search Warrant

Defendant argues that all evidence obtained from the hotel room on September 13, 2014, must be suppressed as "fruits of the poisonous tree,"[2] violating the Fourth Amendment of the United States Constitution, due to the improper search of Defendant at the time of his arrest.  (Doc. 96).   The court has already determined that the search of Defendant's person was a valid search and therefore will not be considered as the basis for challenging the validity of the search warrant.  Therefore, the court will turn to the defendant's argument that the search warrant did not contain reliable information.

When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable.  United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993).

> Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.  If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that

---

[2] Exclusionary rule reaches not only primary evidence obtained as direct result of illegal search or seizure, but also evidence later discovered and found to be derivative of illegality, or "fruit of the poisonous tree," and the rule extends as well to the indirect as to the direct products of unconstitutional conduct. Segura v. United States, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

therefore other information that the informant provides, though uncorroborated, is also reliable.

Id. (citing Gates, 462 U.S. at 233-34; Draper v. United States, 358 U.S. 307, 313 (1959)).

Thus, an informant is considered to be reliable and credible if the supplied information is at least partially corroborated by other sources. United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992); see also United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (court held that search warrant was based on probable cause when the affidavit contained only (1) the informant's statement that the defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison). Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant. United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998). Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause. Id.; United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008).

Although the credibility and reliability of informants are important considerations in the probable cause inquiry, "they are not 'separate and independent requirements to be rigidly exacted in every case.' " United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)(quoting Gates, 462 U.S. at 230)). That is, an informant's statements must be weighed within the totality of the circumstances. Tyler, 238 F.3d at 1039. In addition, probable cause may be

established by the observations of law enforcement and by circumstantial evidence.  United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000).  An important consideration in establishing the credibility and reliability of an informant is whether law enforcement had the opportunity to meet personally with the informant to assess his credibility and whether the informant's information is based on first-hand knowledge rather than rumor or innuendo.  United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008); see also Wells, 223 F.3d at 839 (court noted that police must engage in suitable corroboration of the informant's information if the informant's reputation cannot be assessed because the informant is anonymous); United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (court noted that "there is an inherent indicia of reliability in the richness and detail of first hand observation" by an informant and that the ability of police to question the informant face-to-face gives greater weight to the police's decision to rely on the informant's first-hand observations).  For the reasons previously discussed, the court finds that the Harold's information was reliable given law enforcement's face to face meeting with the informant and their independent corroboration of the relayed facts.

The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a particular description of "the place to be searched, and the persons or things to be seized;" and (3) be based "upon probable cause, supported by an Oath or affirmation."  Dalia v. United States, 441 U.S. 238, 255, (1979); see also U.S. Const amend IV.

Whether a warrant is supported by probable cause requires a legal determination based on whether the warrant is supported by facts that would "justify a prudent person in the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Thurmond, 782 F.3d 1042, 1044 (8th Cir. 2015).

This search warrant was issued by a neutral and detached state court magistrate judge in the Seventh Judicial Circuit Court of South Dakota, supported by an Affidavit in support of the request for Search Warrant (Doc. 79-1), based upon probable cause, supported by an affirmation by Agent Palmer. Based on the facts given by Agent Palmer in his Affidavit in Support of Request for Search Warrant (79-1), probable cause existed in support of obtaining a search warrant.  Facts pertaining to this warrant were described with specificity, from previous corroboration of Harold's statement, management at the Ramkota Hotel, and law enforcement officials.  This court finds that the search warrant was obtained consistent with the Fourth Amendment.

## **CONCLUSION**

In reviewing the facts and circumstances surrounding Defendant's Motion to Suppress Evidence (Doc. 96), this Court finds that the stop, search, and arrest of Defendant on September 13, 2014, was valid under the Fourth Amendment of the United States Constitution.  The stop was supported by not only reasonable suspicion, but also probable cause.  The defendant's consent to search his person was voluntary.  In addition, a neutral and detached South

Dakota State Magistrate Judge from the 7th Circuit independently executed a valid search warrant, authorizing law enforcement to search Defendant's person, room, and vehicle.  Therefore, this court recommends that the motion to suppress be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 17th day of January, 2017.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

21